AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
District of South Carolina

In the Matter of the Seizure of )
*(Briefly describe the property to be seized)* )
2050.51999214281 TETHER ) Case No. 6:25cr516
CRYPTOCURRENCY (USDT) held within account )
527231086 )

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of ___ South Carolina ___ is subject to forfeiture to the United States of America under ___ 18 ___ U.S.C. § ___ 981, 982 ___ *(describe the property)*:

2050.51999214281 TETHER CRYPTOCURRENCY (USDT) held within Nest Services Limited, account number 527231086; incorporated under the law of the Republic of Seychelles with registration number 238045 and address at House of Francis, Room 3

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

USSS Special Agent Joseph Lea
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/2/25

_____
*Judge's signature*

City and state: Greenville, SC 29601

US Magistrate Judge William S. Brown
*Printed name and title*

**AFFIDAVIT**

I, JOSEPH J. LEA, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1. I am a Special Agent ("SA") with United States Secret Service ("USSS") and have been so employed since August 2009. I am currently assigned to the Greenville Residence Office and primarily investigate financial crimes to include wire fraud, identity theft, credit card fraud, bank fraud and money laundering. Prior to becoming an SA with USSS, I was employed as police officer and detective since 2004, where I conducted numerous investigations of fraud schemes. I have received both formal and informal training from USSS and other institutions regarding cyber- and financial-related investigations, digital currencies and computer forensics.

## II.   PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an application for a warrant to seize the following (the "Subject Funds"):

   a. Any and all Tether digital currency ("USDT") held in a custodial wallet under the control of Binance, identified by account number 527231086 (the "Subject Account"), and under the name of Andrew Aya (AYA). AYA is a resident of Warri South, Delta State, Nigeria. The current estimated value of the account is $2,050.51 USD.

3. As described more fully below, there is probable cause to believe that the Subject Funds represent the proceeds of one of more violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1956 (Money Laundering), 1957 (Monetary Transactions in Criminally Derived Property), or a conspiracy to commit the same, (the "Subject Offenses"), committed by AYA and other unknown co-conspirators (the

"Subjects"), and are therefore subject to seizure pursuant to 18 U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).

4. In addition, there is probable cause to believe that the Subject Funds are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853(f) because the property would, in the event of conviction on the alleged underlying offenses, be subject to forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of, or investigation into, this matter.

6. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and amounts are approximations.

### III. SUMMARY OF PROBABLE CAUSE

7. USSS and local law enforcement agencies are investigating a transnational criminal organization running a romance scheme. In brief summary, investigating agents have determined that a fraud group is using social engineering to contact vulnerable often recently widowed individuals and develop a personal relationship with the victim in a long ongoing effort to extort money from the victim. At the point the victim becomes aware of the scam, the victim has

made numerous deposits via wire transmissions and crypto transmissions. By the time the victim becomes aware of the scam, most funds have been laundered and forwarded on past the point investigators can successfully locate the funds.

8. As set forth below, the Subject Account was used by the scammers to receive and launder proceeds of the above-described scheme. Where the Subject Funds cannot be directly traceable to the victims discussed in this affidavit, they are laundered or derivative property found in the same account as the digital currency stolen from victims of this scheme. Finally, investigating agents believe that the Subject Account was created and used primarily for the purpose of laundering scheme proceeds, including outside of the United States. Therefore, there is probable cause to believe that the Subject Funds are subject to seizure and forfeiture by the United States.

## IV. STATEMENT OF PROBABLE CAUSE

9. Based on witness interviews, documents obtained from third parties, reports of interviews conducted by other law enforcement officers, conversations with other law enforcement officers, and publicly filed documents, I know the following:

### A. Background on Digital Currency

10. Digital currency (also known as virtual currency or cryptocurrency)[1] is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a government). Digital currencies

---

[1] For purposes of this affidavit, the terms "digital currency," "cryptocurrency," and "virtual currency" are used interchangeably and address the same concept.

3

exhibit properties similar to other currencies, but do not have a physical form, existing entirely on the internet. Digital currency is not issued by any government or bank (in contrast with fiat or conventional currencies) and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network, often referred to as the blockchain or public ledger. Digital currency is legal in the United States and accepted for legitimate financial transactions. However, digital currency is often used for conducting illegal transactions or for concealing or disguising the true nature, source, location, ownership or control of illegally obtained proceeds. Bitcoin ("BTC") is one of the most commonly used and well-known digital currencies. Ethereum ("ETH") is another popular and commonly used digital currency.

11. A stablecoin is a digital currency whose market value is attached to or "pegged" to another stable asset. Differing from normal digital currencies, the value of stablecoins are pegged to assets such as fiat currencies like the United States Dollar ("USD") or the Euro, or other types of assets like precious metals or other digital currencies. Stablecoins are thus used to mitigate the volatility in the price of digital currency by mimicking the value of a fiat currency, without actually converting digital currency into fiat. While there are various legitimate uses for stablecoins, they are popular with cyber-criminals who seek to hold digital currency proceeds of crime at a stable or near-fixed value without moving those funds into the legitimate financial system into a fiat currency such as USD. Some examples of stablecoins include:

4

        a.    Tether (USDT) was developed by Tether Limited Inc. and is designed to maintain its value at $1.00 USD. USDT can utilize the existing ETH blockchain or the newer TRON ("TRX") blockchain.

12. A digital currency exchange (an "exchange") is a business that allows customers to trade digital currencies for other digital or fiat currencies. An exchange can be a brick-and-mortar business, or strictly an online business. Both brick and mortar and online exchanges accept a wide variety of digital currencies, and exchange them for fiat and traditional payment methods, other digital currencies, or transfers between digital currency owners. Most exchanges are located outside the boundaries of the United States in order to avoid regulation and legal requirements, but some popular exchanges operate inside the jurisdiction of the United States. Binance is an example of a popular online exchange that is located outside of the United States but cooperates with and accepts legal process from American law enforcement agencies.

13. A wallet is a means of storing digital currency identified by unique electronic addresses that allows an individual to conduct transactions on the public ledger. To access a wallet on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private address is similar to a password used to access that account. Even though the public address of those engaging in digital currency transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public address are not recorded. If a real individual or entity is linked to a public address, however, it may

be possible to determine what transactions were conducted by that individual or entity. Therefore, digital transactions are often described as "pseudonymous," meaning they are partially anonymous. Most individuals are identified when they use a digital currency exchanger to make a transaction between digital currency and fiat, or through digital currency exchangers that voluntarily or through legal order, cooperate with law enforcement.

      **B.**    **Background on Romance Scams relating to cryptocurrency**

      14.    What is common across many investment scams when it comes to cryptocurrency is that they initially contact the victim through various avenues using social media. In these cases, the victim is often lured into a personal relationship over a long period of time in which funds are not discussed. Then when the suspect has the victim thoroughly committed, the request for some sort of financial assistance is initiated. Eventually the requests become extensive and with the sense of urgency to prevent in depth questioning.

      **C.**    **Victim S.C. Loses Digital Currency in the Scam**

      15.    Based on conversations, emails, and reports filed by S.C., I learned the following:

          a.    Over the past year and a half, S.C. a resident of Greer, S.C. received communication from an individual with whom she eventually began a romantic relationship. She was in regular communication with this individual to whom she believed to be an individual working for a logging company in the Alaskan and Canadian wilderness. Eventually the suspect began to ask S.C. for funds due to various emergency and unforeseen circumstances, "he" needed money. Over the past year and a half, the victim has sent hundreds of

thousands of dollars via wire transmission and through crypto deposits. Of the wires sent, the accounts that received the funds also appear to belong to elderly females, who are likely similar victims and money mules for the suspects.

    b.    Later in the scheme, S.C. was instructed to send funds via crypto currency. S.C. was provided the cryptocurrency address bc1q6vxeukx5m8fy8h7jl2cv6ms64xrazjs7w40z75. S.C. stated that she has sent funds to this address on numerous occasions and most recently on October 11, 2024.

    16.    I reviewed transaction history for digital currency wallet bc1q6vxeukx5m8fy8h7jl2cv6ms64xrazjs7w40z75 ("Burn Wallet 1") in a commercial blockchain analysis platform. Below is a summary of my review:

    a.    On October 11, 2024, at 21:23 Hrs 0.112081 BTC was deposited into wallet bc1q6vxeukx5m8fy8h7jl2cv6ms64xrazjs7w40z75 via transaction hash: 0650c470a7a306e2c43d6062870e474bd5ed9687e67fdb80119cffcd791e0e84. Based on my training, experience, and information from the victim, I believe this deposit was from S.C. and matches the account information provided to the Greenville County Sheriff's Office. Those funds were quickly sent out to wallet 1JeK9pwAB924xe3F4gRbi7gn3dth1ETMCV ("Suspect Wallet") on October 11, 2024 at 21:40Hrs, via transaction hash: b2aad738d778732cbca17c83f50e00c149c8548d3aa24b8bcb7edf221d91f440.

    17.    I reviewed transaction history for digital currency wallet 1JeK9pwAB924xe3F4gRbi7gn3dth1ETMCV (Suspect Wallet) in a commercial blockchain analysis platform. This wallet was only active for two

7

years, but during that time it received 188 transactions totaling $308,556.12.

### D. Suspect Wallet 1 / Subject Account

18. As discussed previously, Suspect Wallet 1 received numerous deposits from victims as a result of violations of 18 U.S.C. § 1343 (Wire Fraud). As such, there is probable cause to believe that these transfers constituted the proceeds of the Subject Offenses.

19. On November 14, 2024, I reviewed transaction history in Suspect Wallet provided by the hosting exchange, Binance:

    a. Binance identified AYA as the account holder of Suspect Wallet. The wallet became active in October 2022. Since that time, Suspect Wallet received 188 deposits totaling approximately $308,556.12, and sent 486 transactions totaling approximately $273,007.84.

    b. Immediately after the BTC deposits occur, the funds are converted to USDT stable coin via the means of Binance Orders to sell the funds. In this case, approximately 17 minutes after receiving the victim's funds in BTC, the BTC funds are converted to USDT.

    c. As it relates to tracing digital currency stolen from the victim discussed above, after the funds were deposited into the first suspect account Burn Wallet 1, the funds were immediately forwarded on to the Suspect Wallet. After the conversion to USDT, the funds are often forwarded out to other wallets via the TRON network.

20. Based on my training and experience, I believe Suspect Wallet was used by the Subjects to receive proceeds from victims of

wire fraud and to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds obtained from the scam. Therefore, there is probable cause that Suspect Wallet was used to facilitate the commission of the Subject Offenses, contained proceeds of the Subject Offenses and is therefore subject to seizure and forfeiture.

21. The Subject Account bears numerous red flags for a money laundering facilitation account, namely:

a. The volume of transactions in the Subject Account is highly suspicious, with more than $300,000 in USD equivalent of digital currency moved through the wallet associated with the Subject Account in less than 2 years;

b. The Subject Account does not appear to hold digital currency for long, instead rapidly receiving and then retransmitting digital currency, and often in the form of stablecoins;

c. The Subject Account appears to immediately transfer the funds out through a privacy network called TRON;

d. The Subject Account does not appear to be engaged in any investment activity, as digital currency is rapidly moved in and out, and stablecoins are designed not to increase in value greater than the USD;

e. While these amounts might be unsurprising in a commercial or business account, the Subject Account was opened as a personal account with no identified associated business;

f. Public information searches for AYA do not identify any legitimate businesses associated with AYA which would justify a

personal account receiving and sending these volumes of digital currency; and

    g. The transaction activity in the Subject Account appears consistent with a "layering" account in a money laundering scheme, where an account is used primarily to receive and convert criminal proceeds before transmitting the proceed on to another recipient, thus disguising the source of the proceeds and frustrating asset recovery and law enforcement.

22. Based on my own investigation, records provided by Binance, and my training and experience, I believe the Subject Account was used by the Subjects primarily to receive proceeds of romance fraud scams involving digital currency stolen from victims and to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds obtained from the scam. The Subject Account further concealed and disguised the nature of the proceeds by combining the numerous deposits and forwarding from the account via the TRON Network. Therefore, there is probable cause the Subject Account was used to facilitate the commission of the Subject Offenses, contains proceeds of the Subject Offenses of USDT (the Subject Funds) are subject to seizure and forfeiture.

### V. CONCLUSION

23. Based on the facts set forth above, there is probable cause to believe that the Subject Funds are subject to seizure pursuant to 18 U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) (rendering subject to forfeiture any property involved in a violation of 18 U.S.C. §§ 1956/1957) and § 981(a)(1)(C) (rendering subject to forfeiture any property that constitutes or is

derived from proceeds traceable to a violation of 18 U.S.C. §§ 1028, 1028A, 1343, 1344).

24. This affidavit has been reviewed by Assistant U.S. Attorney Carrie Fisher Sherard.

_____
Joseph J. Lea
U.S.S.S Special Agent

Subscribed to and sworn this 2nd day of April ___, 2025.

_____
THE HONORABLE WILLIAM S. BROWN
UNITED STATES MAGISTRATE JUDGE

11